## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                                              **3:05CR17/RV**
                                                                     **3:07CV531/RV/MD**

**MICHAEL R. COFFMAN**

_____

_____ORDER and
_____REPORT AND RECOMMENDATION

  This matter is before the court upon a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255 as supplemented  (doc. 174 & 176).  The government has filed a response (doc. 182) and the defendant has filed a reply (doc. 184).  Defendant also filed another motion to amend (doc. 191) and a notice of supplemental authority (doc. 193).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After a careful review of the record and the arguments presented, it is the opinion of the undersigned that defendant has not raised any issue requiring an evidentiary hearing, Rules Governing Section 2255 Cases 8(a) and (b), and that the motion should be denied.


### BACKGROUND

  Defendant Michael Coffman was charged on Count One of a four count indictment with conspiring with Karen Lowery, Julia Franklin, and others to manufacture and possess with intent to distribute 500 grams or more of a mixture

and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. 841(a)(1), (b)(1)(A)(viii) and 846.[1]   The government filed a notice of enhancement pursuant to 21 U.S.C. § 851 advising the court and the defendant that he was subject to the increased penalty provisions of 21 U.S.C. § 841(b)(1)(A)(viii) due to two previous felony controlled substance convictions (doc. 63).

Codefendants Karen Lowery and Julia Franklin pleaded guilty pursuant to plea and cooperation agreements (doc. 96, at 104-105, 152-153). Defendant, represented by appointed counsel Stephen E. Sutherland, Esq., proceeded to trial.  The facts as adduced at trial, as set forth in the government's response to defendant's motion, are as follows:

> Karen Lowery, one of the defendant's coconspirators, was a lifelong resident of Milton, Florida, who met the defendant in late 2000 at a bar she owned in Milton. (R96-155; R97-36). They began dating in early 2002 and shortly thereafter the defendant moved into Lowery's trailer. (R96-151; R97-36-37).  They lived there together on and off until their quarrels about money, other people, and Lowery's son and daughter finally caused the defendant to move out for good, although they continued to see each other. (R96-160-161, 187, 194; R97-37-38).

> While the defendant was living with Lowery they used and acquired methamphetamine. (R96-107-110, 157-158). According to Lowery, they started getting grams of methamphetamine for their own use and progressed up to getting eightballs (one-eighth of an ounce). (R96-108-109, 157-158). Their original source for the drug was a woman named Angie but they later met coconspirator Julie Franklin and began getting their methamphetamine from her. (R96-107-109, 158-159). At first, the defendant and Lowery purchased a single eightball at a time for their own use but they later began purchasing additional eightballs for other people, using the profit they made from selling methamphetamine to pay for what they were using. (R96-159).

---

[1]The indictment was redacted during trial to exclude reference to "manufacture" because there was no evidence presented that the conspiracy involved the manufacture of methamphetamine.  (Doc. 96 at 261-262).  The indictment also contained a forfeiture provision.

The source for the methamphetamine that Julia Franklin sold to the defendant and Lowery was a woman from Atlanta who Franklin had started using as a source in December 2003 or January 2004. (R96-109-111). According to Franklin, she first met the defendant when he came to her house to purchase methamphetamine and a month later she met Karen Lowery. (R96-107-108, 133-134). Within a month of establishing her relationship with the defendant and Lowery, the defendant and Lowery contacted her to tell her about a new source for methamphetamine. (R96-109-111, 135-137).

The new source was a man named Robert Smith who Karen Lowery had known on a casual basis for several years. (R96-162-163). The defendant brought Smith to Lowery's trailer one day to discuss establishing a relationship for the purpose of acquiring methamphetamine. (*Id*.). Smith explained he had a source in Atlanta and could get methamphetamine for between $1150 and $1250 per ounce. (*Id*.). Smith agreed to go to Atlanta to get the methamphetamine for them if they would pay him $200 and two eightballs per trip. (R96-165). The defendant and Lowery later met with Julia Franklin and while they all used methamphetamine, the defendant and Lowery told Franklin they had a source for methamphetamine that was better and cheaper than hers; Franklin agreed to start getting her methamphetamine through the defendant and Lowery. (R96-109-111, 135-137, 163-165).

Between approximately January or February 2004 and April 2004 the defendant made approximately eleven trips to Atlanta with Robert Smith. (R96-110, 129, 145, 167, 169, 193, 200). On the first trip the defendant took $2600 with him to bring back one ounce of methamphetamine for Lowery and one ounce for Franklin. (R96-112-114, 168). According to Franklin, she would usually drop her money off at the defendant's and Lowery's trailer before the trip but sometimes the methamphetamine was "fronted" to her. (R96-111-113). She testified that she gave the money to Lowery but did not try to hide the money from the defendant "because he was part of it." (R96-113). After their first trip, the defendant and Smith traveled to Atlanta approximately once a week, returning with amounts ranging from between two and three ounces on most trips, up to five ounces on the last trip. (R96-115, 122, 169, 200-202). The defendant received approximately an eightball as payment for each trip. (R96-167).

Julia Franklin testified that she did not know the identity of the Atlanta source but knew the defendant and Smith were the ones going

to get the methamphetamine because they were the ones who took the money; she saw them leave for the trips together, saw them return from the trips, and on one occasion accompanied them to Atlanta. (R96-115-116). She explained that on the trip when she was invited to ride along, the defendant and Smith had already started out before she got her money to them so they arranged to turn around and pick up the money from her at a rendevous point. (R96-117-118). The defendant and Smith were in Smith's van when they met Franklin, who was driving a Mustang convertible. (R96-117-119). The men invited Franklin to go with them and she agreed. (*Id.*). They decided to make the trip in Franklin's Mustang. (R96-118-119). Franklin gave her money for the methamphetamine to the defendant, who put it under the passenger's seat with the other money he was carrying. (R96-119, 140-141).

When they arrived in Atlanta, the men left Franklin at a Waffle House restaurant, took the money with them, and later returned and rented a motel room where the three waited for approximately four hours. (R96-121). Eventually Smith got a telephone call, Smith and the defendant left, were gone for approximately one hour, and returned to the motel room with five ounces of methamphetamine, one ounce of which belonged to Franklin. (R96-121-122). The men did not tell Franklin where they went to get the methamphetamine but did tell her that their source was a group of Mexicans who lived in a nice house. (R96-125-126). On the return trip they all smoked methamphetamine. (R96-122-123).

When Smith, the defendant, and Franklin arrived at the location where they had parked Smith's van, Smith left in his van and the defendant went with Franklin to her house in Pensacola. (R96-123). While they were there, the defendant used Franklin's scales to weight the methamphetamine and separated from the five ounce load the ounce that belonged to Franklin. (R96-126, 142). The defendant spent that night at Franklin's house, and according to Karen Lowery, the defendant did not return to the trailer nor did he deliver to her the methamphetamine from that trip. (R96-123, 172, 193-194,196). Lowery testified that Robert Smith attempted to straighten things out between her and the defendant but apparently did not succeed because Lowery testified the defendant stole $6000 from her. (R96-172, 196).

Christopher Cade, a convicted felon, volunteered to law enforcement his services as a confidential informant when he was facing burglary charges and a charge of violating his probation.

(R96-12-16, 36-37, 57-60, 86). Cade, who testified under a promise of use immunity, testified that when he and his girlfriend began their drug association with the defendant and Karen Lowery, they started getting pills, and within a matter of weeks of meeting them began getting methamphetamine. (R96-89). Cade said he first bought methamphetamine from the defendant either at the trailer he shared with Lowery or at the welding shop where the defendant worked. (R96-61-65). Cade testified that he usually purchased quarter or half gram quantities of methamphetamine from the defendant but that he purchased larger amounts such as eightballs from Lowery. (*Id.*). Cade testified the defendant used methamphetamine with Cade and his girlfriend, that he had gotten methamphetamine from the defendant at the trailer the defendant shared with Lowery, and that he had seen the defendant using scales and bagging various quantities of methamphetamine in the master bedroom of the trailer. (R96-80-85).

Christopher Cade was used by law enforcement to make three controlled purchases of methamphetamine between March 3, 2004, and April 6, 2004, during which he purchased 3.5 grams, 3.0 grams, and 25.5 grams of methamphetamine. (R96-19-34, 47-49, 68-76; R97-85-91). The first purchase was made from Karen Lowery at her trailer and the second was made from Lowery at a used tool and flea market shop she owned and was preparing to open. (R96-19-26, 69-72, 157). The third controlled purchase was made at the tool shop with $1600 Cade was given by law enforcement to purchase an ounce of methamphetamine. (R96-28-30, 75-76).  Cade handed the money to Lowery after which the defendant removed the package of methamphetamine from a box and handed it to Cade. (R96-75).

Sometime after the third controlled purchase, law enforcement discontinued using Christopher Cade in an undercover capacity because a urinalysis test taken by his probation officer returned positive for marijuana. (R96-79). Thereafter the defendant called Cade several times and then went to Cade's house to get Cade to ride to Atlanta with him. (*Id.*). Cade called his law enforcement contacts to tell them about the planned trip but was told that due to his failed drug test, law enforcement could no longer use Cade for investigation purposes. (*Id.*).

Joshua Mauldin, who contacted law enforcement about the defendant's involvement with methamphetamine distribution while he was in jail facing charges of violating his probation, testified under a

grant of use immunity. (R96-204-212, 245-246). In 2003, Mauldin was using methamphetamine with Robert Smith and was also buying the drug from Smith. (R96-212-214). It was during that time that Smith introduced Mauldin to the defendant at Karen Lowery's trailer for the purpose of purchasing methamphetamine from the defendant. (*Id.*). Mauldin testified that he purchased methamphetamine from the defendant one time at Lowery's trailer and one time at Robert Smith's residence. (R96-214).  Joshua Mauldin testified he knew about Robert Smith's trips to Atlanta to acquire methamphetamine because he was living with Smith in Smith's trailer during that time, he had heard Smith and the defendant talk about the trips, and in 2004 Mauldin accompanied Smith on three of the fourteen to twenty trips Mauldin estimated Smith made. (R96-216-219, 242, 248). Mauldin testified in detail about his third trip when the defendant also made the trip to Atlanta and they purchased between eight and ten ounces of methamphetamine. (R96-218-241). The defendant carried the money with him in a brown envelope and on the way back to Florida in Smith's van, they used a scale to weigh and divide the methamphetamine into smaller quantities for the different people who had contributed money for the trip. (R96-238-239). Mauldin testified that he did not know the identity of the Atlanta source but described the source's associates as Hispanics who operated out of a luxurious or upper class house. (R96-229-231).

        The defendant testified on his own behalf. (R97-34-82). He denied any involvement in the methamphetamine business, denied transporting it, selling it, or assisting Karen Lowery to sell it, denied having any drug relationship with Julia Franklin, and denied using methamphetamine, marijuana, pills, or cocaine after he was released from jail in December 2002. (R97-40-43, 46, 48, 52-56, 59-64, 67-70, 74-75). He testified he had no drug involvement with Robert Smith and that the only reason Smith ever came to Lowery's trailer was to do some bulldozer work. (R97-60-62). He testified that everything testified to by Joshua Mauldin was a lie, and that Christopher Cade, Julia Franklin, and Karen Lowery all lied when they testified at trial that he was involved with methamphetamine. (R97-63, 78-80).

(Doc. 182 at 4-12).

        After hearing the evidence, the jury convicted the defendant of the single charge against him.  (Doc. 65-71).  After the verdict was announced, the government

advised the court of an agreement reached with the defendant in which the defendant agreed to forfeit $15,000 to the government. (PSR ¶ 2). The government indicated at sentencing, however, that in light of the sentence imposed, it would not pursue the stipulated forfeiture. (Doc. 98 at 39).

In the PSR, Defendant was held accountable for 926 grams of methamphetamine, yielding a base offense level of 32. (PSR ¶ 61). His total offense level was 34 after a two level adjustment for obstruction of justice due to his false testimony at trial. (PSR ¶¶62-70). His criminal history category was VI. Defendant objected to the quantity of drugs attributed to him, although the objection did not affect the base offense level, and also objected to a two level adjustment for possession of a firearm, an objection that was sustained at sentencing. The applicable guidelines range would have been 262 to 327 months, but for the defendant's two prior controlled substances offenses, which subjected him to a mandatory sentence of life imprisonment. Defendant was in fact sentenced to a term of life imprisonment.[2]   The court expressly noted on the record that it found the sentence to be excessive and more than warranted in defendant's case, but that it had no discretion to depart under the circumstances. (Doc. 98 at 37).

Defendant appealed, contending that there was insufficient evidence to convict him and that the district court erred in applying the obstruction of justice adjustment. (Doc. 133 at 2). The Eleventh Circuit affirmed, finding that the evidence was sufficient to support a conviction, and that the imposition of the life sentence rendered any potential Guidelines error moot.   (Doc. 133).   With respect to defendant's argument with respect to the character of the witnesses who testified against him, the Eleventh Circuit stated that "[a] defendant's conviction is not subject to reversal even though it relies on the testimony of 'an array of scoundrels, liars and brigands,' unless that testimony is 'unbelievable on its face' – i.e., if the

---

[2]Karen Lowery and Julia Franklin were sentenced to a term of 34 months and 24 months imprisonment respectively.

testimony is about facts that the witness 'physically could not have possibly observed or events that could not possibly have occurred under the laws of nature.'" (Doc. 133 at 5 (citing *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997))).

In the present motion, defendant raises nine grounds for relief, including a claim of cumulative error. The government opposes the motion in its entirety.

## LEGAL ANALYSIS

### General Standard of Review

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law or (4) is otherwise subject to collateral attack.  28 U.S.C. § 2255; *Thomas v. Crosby,* 371 F.3d 782, 811 (11th Cir. 2004); *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2678, 2649, 91 L. Ed. 2d 397 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent. . . ."

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence.  *See Chandler v. McDonough,* 471 F.3d 1360

(11th Cir. 2006) (citing *Drew v. Dept. of Corrections,* 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); *Hill v. Moore,* 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."); *Ferguson v. United States*, 699 F.2d 1071, 1072 (11th Cir. 1983).  A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record.  *Peoples v. Campbell*, 377 F.3d 1208, 1237 (11th Cir. 2004); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted).  Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing.  *Lynn*, 365 F.3d at 1239.

## Ineffective assistance of counsel claims

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal.  *Massaro v. United States,* 538 U.S. 500, 503, 123 S.Ct. 1690, 1693, 155 L.Ed.2d 714 (2003); *see also United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002); *United States v. Jiminez*, 983 F.2d 1020, 1022, n. 1 (11th Cir. 1993).  To show a violation of his constitutional right to counsel, defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy.  *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Gaskin v. Secretary, Dept. of Corrections,* 494 F.3d 997, 1002 (11th Cir. 2007).  In applying *Strickland*, the court may dispose of an ineffective assistance claim if defendant fails to carry his burden on either of the two prongs.  466 U.S. at 697, 104 S.Ct. at 2069.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see also Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992).  "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) (citing *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988); *Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight.  *Strickland*,  466 U.S. at 689, 104 S.Ct. at 2065.   To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Gordon v. United States,* 518 F.3d 1291, 1301 (11th Cir. 2008); *United States v. Freixas*, 332 F.3d 1314, 1319-1320 (11th Cir. 2003); (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002)(quoting *Strickland*, 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)).  When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect."  *Chandler*, 218 F.3d at 1316 n. 18.

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.  For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not

entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).   Defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687).   Or in the case of alleged sentencing errors, defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. *Glover v. United States*, 531 U.S. 198, 203-04, 121 S.Ct. 696, 700-01, 148 L.Ed.2d 604 (2001).   A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance."   *Id.*

To establish ineffective assistance, defendant must provide factual support for his contentions regarding counsel's performance.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test.  *Wilson v. United States,* 962 F.2d 996, 998 (11th Cir. 1992); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990) (citing *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629); *United States v. Ross*, 147 Fed.Appx. 936, 939 (11th Cir. 2005).[3]

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between."  *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).   This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Dingle,* 480 F.3d at 1099; *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision

---

[3]The undersigned recognizes that *Ross*, as well as any other unpublished cases cited herein, are not considered binding precedent, but are cited only as persuasive authority.  *See* 11th Cir. R. 36-2.

will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle*, 480 F.3d at 1099 (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).

### Testimony of Joshua Mauldin

Defendant contends that counsel was constitutionally ineffective because he failed to file a motion in limine requesting that the district court exclude testimony pertaining to drug activities in which Mauldin and the defendant allegedly participated. Defendant claims that such testimony violated Fed.R.Evid. 401, 402, 403 and 404(B). Defendant states that during trial he told counsel that he had never seen, heard or known of Mauldin before, and that Mauldin's testimony was suspect. He argues that the testimony was improper because it did not concern and was totally separate from the conspiracy charged in the indictment, and that it was in conflict with a previous testimonial statement of Mauldin.

At trial, the government questioned Mauldin about his prior criminal record, his current incarceration status, the fact that he was testifying pursuant to a grant of use immunity, and his use of methamphetamine. (Doc. 96 at 205-208, 213-214). Most of his testimony related to an individual called "Bubbahead," although he did testify that defendant accompanied Bubbahead and Mauldin on one trip to Atlanta to purchase methamphetamine. (*Id.* at 217-218, 227-240). Defense counsel impeached Mauldin with inconsistencies between his trial and grand jury testimony. (*Id.* at 251-253). Defendant personally had the opportunity to discredit Mauldin's testimony when he testified on his own behalf at trial. He denied knowing Josh Mauldin, or even knowing who Mauldin was until he came to court. (Doc. 97at 44-45, 63). Government witness Karen Lowery also denied knowing Mauldin. (Doc. 96 at 193).

Defendant also raised his issues with Mauldin's testimony during his allocution at sentencing. The court concurred that some of what Mauldin said was

of questionable credibility, but also stated that it did not have much materiality to the charges against the defendant, such that "regardless of any questions about his credibility . . . that [did not change] the weight of the evidence." (Doc. 98 at 23). In fact, even the appellate court did not heavily rely upon Mauldin's testimony in its recitation of the evidence against defendant, mentioning only that Mauldin witnessed Coffman's purchase of methamphetamine in Atlanta. (Doc. 133 at 4-5).

Defendant has not shown that a motion by counsel pursuant to any of the Rules of Evidence he cited, Rule 401, 402, 403 or 404(b) would have been granted. Nor has he shown, in light of the abundant other evidence against him, that the outcome of the proceedings would have been different had Mauldin's testimony been excluded, or had counsel been able to use prior inconsistent statements of Mauldin to further impeach him. The information adduced in his motions to amend (doc. 176, 191) does not alter this conclusion.

### Undisclosed Exculpatory Evidence

Defendant claims that the government failed to disclose a prior inconsistent statement by Joshua Mauldin, and that this denied him a fair trial.

On June 8, 2006, while his appeal was pending in the Eleventh Circuit, defendant filed a motion with respect to Mauldin's prior inconsistent statement entitled "Pro Se Motion with supporting affidavit for Judge Vinson to take Judicial Notice and Order an Evidentiary Hearing Concerning Newly Discovered Documents which were withheld by the Government in a Fraudulent Manner." (Doc. 121). The district court denied the motion for lack of jurisdiction (doc. 123) and the defendant appealed. On appeal the defendant argued, the government conceded, and the Eleventh Circuit held that the motion was cognizable as a Rule 3(b)(1) motion for a new trial based on newly discovered evidence. The case was remanded to the district court, the government was given the opportunity to respond, and the defendant replied. (Doc. 151). By the time the Eleventh Circuit entered its order, the

direct appeal had concluded.  (Doc. 151 at 2 n.2).  In any event the district court entered a thorough order on the issue in which it found that it was not reasonably probable that the outcome of the trial would have been different if counsel had Mauldin's earlier statement to use as impeachment evidence, that Mauldin's testimony was "not as indispensable and central as the defendant suggests," and in sum that the prior inconsistent statement allegedly withheld by the government was not material. (Doc. 151 at 9, 11 & 12).

Defendant now attempts to claim counsel was constitutionally ineffective because he failed to investigate, validate or diligently pursue such information.  In light of the district court's well-reasoned finding that the information in question was not "material" and would not have changed the outcome of the proceedings, no claim of ineffective assistance of counsel can lie.  His attempt to relitigate the matter under the guise of ineffective assistance of counsel is unavailing.

Defendant also claims that witnesses Karen Lowery and Julia Franklin were involved in separate conspiracies that were not disclosed as trial.  Defendant claims trial counsel was constitutionally ineffective because he failed to confront these witnesses on their "additional drug conspiracy excursions," citing *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039.  The principles of Sixth Amendment, as reiterated in *Cronic*, that a defendant has the right to be confronted with the witnesses against him has no bearing on defendant's claim that the witnesses were not confronted with questions about their own criminal activity unrelated to defendant's case.

<u>Faulty Indictment</u>–Methamphetamine as Schedule II or Schedule III

The defendant's third and fifth grounds for relief both relate to the classification of methamphetamine as a Schedule II versus a Schedule III drug. Defendant claims that the indictment against him was defective because it failed to charge all elements of the offense.  He asserts that the indictment fails to put him on

notice as to whether a Schedule II or Schedule III substance was involved.  He also contends counsel was constitutionally ineffective for failing to make an argument pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000), because such reclassification improperly increased the statutory maximum penalty.

Defendant's claim that methamphetamine is a schedule III drug rather than a schedule II drug is patently frivolous. Pursuant to 21 U.S.C. § 811(a)(1) all forms of methamphetamine are classified as Schedule II drugs.  21 C.F.R. § 1308.12(d);  see also *United States v. Macedo*, 406 F.3d 778, 785 (7th Cir. 2005) ("[W]e now find that the reclassification of methamphetamine as a schedule II substance applies to all forms of methamphetamine in accordance with 21 C.F.R. § 1308.12(d) despite the statute's distinction."); *United States v. Turner*, 187 Fed.Appx. 698, 700 (9th Cir. 2006) ("We have held that the Attorney General properly rescheduled all forms of methamphetamine to Schedule II, despite language in 21 U.S.C. § 812(c) that includes some forms of methamphetamine in Schedule III."); *United States v. Gori*, 324 F.3d 234, 240 (3rd Cir. 2003) (reasoning that 21 C.F.R. § 1308.12(d) must supercede 21 U.S.C. § 812(c)'s schedule classification as the Attorney General acted pursuant to express authorization and the regulation was properly promulgated); *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994); *United States v. Kendall*, 887 F.2d 240, 241 (9th Cir. 1989) (per curiam).

Methamphetamine was rescheduled to a Schedule II drug in 1971, and the process by which the rescheduling occurred has been upheld by every court that has considered it, including the Eleventh Circuit. *See United States v. Lane*, 931 F.2d 40, 41 (11th Cir.1991) (citing cases).   *Apprendi* has no application in the administrative and legislative scheduling of a drug, and defendant has cited to no authority to support such a proposition. See *United States v. Stevens,* 168 Fed.Appx. 264  (10th Cir. 2006) (no ineffective assistance of counsel claim lies for failure to object to sentence considering methamphetamine as Schedule II rather than

Schedule III drug) (citing *United States v. Zamora*, 784 F.2d 1025, 1029-30 (10th Cir. 1986).   *United States v. Duran*, 219 Fed.Appx. 762, 763-64 (10th Cir. 2007) (denying certificate of appealability based on substantially similar argument).   Thus, neither trial nor appellate counsel was ineffective for failing to raise an obviously meritless argument, as it is well established that counsel is not ineffective for failing to preserve or argue a meritless claim.  *Freeman v. Attorney General, Florida,* 536 F.3d 1225, 1233 (11th Cir. 2008); see also *Brownlee v. Haley,* 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit).

### Failure to obtain new counsel for appeal

Defendant contends that he should have been appointed different counsel for his appeal, in light of his "conflicts" with his trial counsel.  The conflicts stemmed with counsel's refusal to follow certain instructions of the defendant in conducting his defense.  Defendant raised this issue with the trial court before his appeal, citing counsel's alleged incompetence in his motion requesting appointment of alternate counsel, but his motion was denied.  (Doc. 104 & 105).

Due process of law requires that a defendant receive effective assistance of appellate counsel on his direct appeal.  *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).  However, the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue on appeal if counsel, as a matter of professional judgment, decides not to do so.  *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Heath v. Jones*, 941 F.2d 1126, 1130-31 (11th Cir. 1991); *Francois v. Wainwright*, 741 F.2d 1275, 1285 (11th Cir. 1984).  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  *Barnes,* 463 U.S. at 751-52, 103 S.Ct. at 3313.  The mere fact that one of the non-appealed issues might have been successful does not preclude a finding that the appellate advocacy, which

must be judged in its entirety, was effective.   *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed. 2d 434 (1986).   To determine whether defense counsel rendered ineffective assistance by failing to raise certain issues on appeal, the court must examine the merits of the issues the defendant alleges counsel was derelict in not raising on appeal. *Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988).   Of course, appellate counsel is not ineffective for failing to raise claims "reasonably considered to be without merit."   *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (citations omitted); see also *Lambrix v. Singletary*, 72 F.3d 1500, 1507 (11th Cir. 1996); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000).   And, where the case law at the time of the direct appeal is not clear on an issue, appellate counsel's performance does not fall below the "objective standard of reasonableness" for failing to raise it.   *See Jones v. United States,* 224 F.3d 1251, 1258-59 (11th Cir. 2000); *Chateloin v. Singletary,* 89 F.3d 749, 754 (11th Cir. 1996).   An informed decision based on reasonable professional judgment not to pursue a particular issue on appeal does not render counsel's performance deficient.   See *Griffin v. Aiken,* 775 F.2d 1226, 1235 (4th Cir. 1985).   Although defendant clearly was disappointed with the outcome of his case, his disagreement with Mr. Sutherland about tactical matters at trial or which issues to pursue on appeal does not entitle him to the appointment of alternate counsel on appeal.   Furthermore, he has failed to show that he was prejudiced by Mr. Sutherland's representation of him, as required by *Strickland*.


### Jury Instructions

Defendant first objects to the pattern jury instruction contained at page 20 of the court's instructions to the jury in which the jurors are advised of their duty to deliberate and   informed that their only interest is to "seek the truth from the evidence in the case."   (Doc.   70 at 11).   Defendant claims that this instruction essentially relieved the government of its burden to prove each and every element of the offense beyond a reasonable doubt, and that counsel was ineffective for

failing to object to this instruction.  The constitutionality of the instruction at issue, with the exception of the portion cited by defendant, has been affirmed by the Eleventh Circuit.  *United States v. Salazar*, 245 Fed. Appx. 1 (11th Cir. 2007) (citing *United States v. Brokemond*, 959 F.2d 206, 209 (11th Cir. 1992)).  In *Salazar*, the court specifically examined the sentence of which defendant now complains and was "not persuaded that the supplemental instruction's admonition to 'seek the truth' undermined the jury's understanding of the district court's instruction on reasonable doubt." 245 Fed.Appx. 1 at *5; accord *United States v. Gonzalez-Balderas,* 11 F.3d 1218, 1223 (5th Cir. 1994); *United States v. Goodlow*, 597 F.2d 159, 163 (9th Cir. 1979). Contrary to defendant's assertion, counsel was not constitutionally ineffective for his failure to object to this instruction.

To the extent defendant contends that counsel should have objected that the jury instructions improperly amended the indictment, this is a variation of his argument with respect to Schedule II versus Schedule III methamphetamine, and is without merit.

Lastly, defendant raises two seemingly contradictory claims.  He claims that the use of a special verdict form deprived him of the requisite unanimity of the verdict assurance, and simultaneously claims that the use of a general verdict pattern form did the same thing.  The government did not address this issue, perhaps because defendant's argument is unclear.  Again, however, to the extent he argues that counsel should have objected to the fact that Schedule II versus Schedule II was neither specified in the jury instructions nor in the indictment, his argument is without merit.  There is no basis for defendant's apparent argument that he was deprived of a unanimous verdict.  The jury verdict form (doc. 71) reflects that the jury found defendant guilty of the offense as charged in Count One of the Indictment, and when the jurors were individually polled, the verdict was found to be unanimous.  (doc. 97 at 107-109).

### Career Offender Enhancement

Defendant challenges the application of what he refers to as the career offender enhancement to his case on several grounds. Actually defendant was not sentenced under the U.S.S.G. Career Offender provisions, § 4B1.1 and 4B1.2, which, in essence, require prior convictions for trafficking to support the application of the provision. Instead, defendant's life sentence came about through the application of 21 U.S.C. § 841(b)(1)(A)(viii) which merely requires two or more convictions for a felony drug offense, which includes simple possession. In any event, none of defendant's arguments have merit.

Defendant first directs the court's attention to the sentence on page two of the plea agreement that provides "if the Court determines that defendant has two prior qualifying felony drug convictions under 21 U.S.C. §§ 841 and 851, he faces a minimum mandatory term of Life imprisonment." He argues that the underlying state offenses, possession of marijuana and possession of a controlled substance, were not punishable under 21 U.S.C. §§ 841 or 851, and therefore they should not have been used to enhance his sentence. (Doc. 174 at 21, doc. 193 at 2). Defendant reads the terms of the plea agreement incorrectly. The agreement does not require that the convictions themselves were pursuant to 21 U.S.C. §§841 and 851, or no state court convictions could serve as the basis for enhanced penalties. Rather the agreement provides that the convictions must be qualifying convictions in accordance with the terms of those statutes. Defendant's prior felony possession convictions count. See *United States v. Harris*, 241 Fed.Appx. 669, 670-671 (11th Cir. 2007) (affirming application of statutory mandatory minimum based upon previous conviction for simple possession); *United States v. Hansley*, 54 F.3d 709 (11th Cir. 1995) (affirming application of mandatory life sentence based upon previous conviction for simple possession). To the extent defendant claims that counsel was ineffective because counsel never told him that defendant's state drug convictions could be used to enhance his sentence, defendant does not explain how any

prejudice inured.  In light of his continued protestations of innocence, even after conviction, he cannot now claim that he would have entered a plea of guilty had he known the penalty he faced, as the court would not have accepted such a plea absent an admission of guilt.   Furthermore, the district court specifically found at sentencing that defendant was aware of the penalties he faced.  (Doc. 98 at 10-12).

Defendant also claims that his due process rights were violated because the state offenses did not qualify as "serious drug offenses" under 18 U.S.C. § 3559(c)(1)(ii).  Title 18 U.S.C. § 3559(c)(1)(ii) has no application to defendant's case. This section provides for a mandatory term of life imprisonment, notwithstanding any other provision of law if a person is convicted of a serious violent felony and has previously been convicted of one or more serious violent felonies and one or more serious drug offenses.  Defendant's current conviction is not a serious violent felony.

Defendant contends that his prior convictions should not have been counted as two separate offenses, since he was sentenced for the underlying offense conduct on the same day.  Drug transactions which occur at different times are separate offenses for purposes of § 841 even if they are consolidated for sentencing, as they were in defendant's case.  *United States v. Griffin*, 109 F.3d 706, 708 (11th Cir. 1997).

Finally, defendant affirmed his two prior felony convictions, so the government was not required to provide fingerprint cards to prove his identity. (Doc. 98 at 12).

### *Booker* argument

Defendant claims that counsel should have raised a *Booker*[4] argument on appeal because of alleged errors in his sentence.  He incorrectly argues that his sentence exceeded the statutory maximum, when in fact it did not.  When a district

---

[4]*United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

court correctly imposes the statutory mandatory minimum sentence for an offense, any error in the Guidelines calculations is harmless, and a defendant's claim that his sentence is unconstitutional in light of *Booker* lacks merit. *United States v. Raad*, 406 F.3d 1322, 1323 n.1 (11th Cir. 2005). Additionally, the Eleventh Circuit reached the same conclusion on appeal, (doc. 133 at 7), and it is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal. *United States v. Nyhuis,* 211 F.3d 1340, 1343 (11th Cir. 2000); *Mills v. United States*, 36 F.3d 1052, 1056 (11th Cir. 1994).

### Cumulative error

Defendant's last claim for relief is that the cumulative effect of the errors discussed above, and others, entitle him to relief. It is true that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary even if the errors considered individually are non-reversible. See, e.g., *U.S. v. Ramirez,* 426 F.3d 1344, 1353 (11th Cir. 2005); *United State v. Preciado-Cordobas*, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)(citing *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984)); *United States v. Adams*, 74 F.3d 1093,1099 (11th Cir. 1996); *United States v. Thomas,* 62 F.3d 1332, 1343 (11th Cir. 1995). However, "[a] defendant is entitled to a fair trial not a perfect one." *Ramirez,* 426 F.3d at 1353 (quoting *United States v. Adams,* 74 F.3d 1093, 1099-1100 (11th Cir. 1996) (citing *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953))). The alleged errors identified by defendant were either discredited above or are conclusory statements of error that are not supported by argument or record citation. The court cannot find that these errors, either individually or in combination, compromised the defendant's constitutional rights.

**Based on the foregoing, it is ORDERED:**

**Defendant's motion to amend § 2255 motion (doc. 191) is granted to the extent the arguments contained in this amendment have been taken into consideration in the preparation of this recommendation.**

**And it is respectfully RECOMMENDED:**

**The motion to vacate, set aside, or correct sentence (doc. 174) be DENIED.**

**At Pensacola, Florida, this 5th day of February, 2009.**


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. <u>See</u> 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**